Good morning, your honors. If it may please the court, my name is Russell Handy. I represent the plaintiff and the appellant in this case, Robert Miller. Brief recitation of the facts, I believe. The court's probably fairly familiar with them. My client is a quadriplegic. He's a regular and ongoing patron of the California Speedway that's located in Fontana, California. He's gone, since its opening in 1997, he's gone to the races on an average of three to six times every single year since that time. In this case, the issue that has brought us all here is the question of how do we interpret the regulations and whether or not deference should be given to the Department of Justice's interpretation of the Americans with Disabilities Act accessibility guidelines, specifically 4.33.3. In this case, the issue that became before the court was whether or not the regulations require a newly built state stadium, a stadium like the one in this case that has been built after the passage of the ADA to provide line of sight from its wheelchair seating areas over standing spectators in stadiums where spectators are expected and regularly do stand, like race car events. The Department of Justice interpretation is found in their technical assistance manual and has been the same since 1994 for the last 14 years is that it does, that this section of the ADAG, which requires lines of sight comparable for wheelchair users, for other ambulatory persons, does mean line of sight over standing spectators in events where you know spectators are going to stand. Counsel, is it your position that the Department's regulations meant that from the beginning? It is. It is. I think there is a good argument to be made that the Access Board, when they proposed their version of the regulations, when they proposed the regulations based on their commentary that's found in the Federal Register, I think there's a good argument that can be made that the Access Board may have believed that it didn't go that far, that this was something that may have to be addressed later. But the Department of Justice and they adopted it and it became part of the final enforceable regulations. They did not adopt the commentary by the Access Board, which is a completely different organization. They did not adopt that. They never adopted that. And their very first interpretation of this rule, their very first interpretive statement was in the technical assistance manual. It was only months after the regulations became enforceable. Well, yeah, but that would have been the first edition of the technical assistance manual, which is not the 94 edition, right? Right. The first edition said nothing about it. It was silent as to that. It was the 1994 supplemental edition to the technical assistance manual. And remember, 1994 is only months after the regulations became enforceable. They were passed in 1991, but there was a grace period that all businesses had in order to come to compliance and so forth. And that's found in the... When did they become enforceable? They became enforceable in 1993. When was this facility constructed? It was first opened in 1997. And the undisputed fact as stated by the district court, Judge Larson, is that this is new construction well after the effective date of the ADA. And so... What are we supposed to do, though? I mean, this whole thing is just a... The whole construction of this is just a little odd. In that the department says, look, we're going to let the board do the heavy lifting. We'll probably adopt anything that the board adopts. And it does. It adopts the word for word. The regulations. Right. It doesn't say anything about the commentary. I see the problem. But it does adopt it word for word, which might leave sort of a reasonable observer thinking, well, the attorney general did exactly what she said she was going to do. She was going to adopt whatever the this vertical line of sight problem. Right. And the question is whether or not the Department of Justice should be bound, from a legal standpoint, bound by the commentary held by the Access Board, or even by any interpretation that the Access Board might have held. And the problem in this case is, first of all, the interpretation that everyone points to by the Access Board is not a strong statement of interpretive effect. It's a musing, tentative commentary that says a lot of commentators have noted that perhaps the regulation should deal with line of sight over standing spectators. We invite further comment on this. And we'll deal with it in the future. Yeah. And then their second one said that this will be addressed more adequately in the Recreational Facilities Guideline, which to this day still has a min pass. Okay. That was my next question. Has the board ever addressed this vertical line of sight problem? It never has. And there's probably a lot of reasons for that. One is that... One is that it may have been mooted by the 1994 Technical Assistance Manual. And that's the other argument. And when you say a reasonable observer, certainly someone that's in the position of the defendant in this case, who are building their facilities and they're going to open it in 1997, are well put on notice. If they were building it in that short period of time, from the time the Access Board's commentary was published in the Federal Register until the Department of Justice published its formal interpretation in the Technical Assistance Manual, you might have some argument that there's something unfair to the reasonable observer. But this was built after the 1994 publication of the Technical Assistance Manual. They are completely on notice that this is how the Department of Justice formally interprets this regulation. And so any reasonable observer, if we're going to use that, I'm not sure if that really plays a role in this legal analysis, but any reasonable observer is on notice that this is how the Department of Justice, which is the organization that's been vested with the authority to implement these regulations, that come out with advisory materials and technical assistance manual materials, has interpreted this. And their position has been consistent. And one of the problems in this case is that Judge Larson, in his decision, he says quite eloquently, I think, he says, there's no doubt if I was writing from a blank tablet, I would absolutely require line and slide overstanding spectators. It makes no sense otherwise. Wheelchair users who go there, but they can't see half the race and all the important parts, it doesn't make any sense. And every court, all four of the published courts that have looked at this have said the same thing, that that interpretation by the Department of Justice is entirely, in fact, wholly consistent, is the word some of these courts have used, interpretation of that regulation. But Judge Larson, as did the Independent Living Court and the Blockbuster Court, said, but even though it's completely consistent and reasonable, because it's a change from a previous interpretation, our hands are tied. And Judge Larson said, I just cannot give deference to that second interpretive ruling unless it complies with the notice and comment provisions of the APA. But I think that there's an error there, because there is no, when the Independent Living Court said that, they said, when you make a substantive change, when you make a second interpretive rule, and it changes from a previous interpretive rule, you have to go through the notice and commentary provisions of the Administrative Procedures Act. But when I look carefully at that, and I ask the court to do the same, what authority that that Independent Living Court cites for that bold proposition, they only cite two D.C. court circuit decisions. It's the only decisions they cite, and neither of them stand for that proposition. The Ninth Circuit, in the Erringer case, and that's at 371 F. 3rd, 625, published in 2004, says, and this is a quote, no notice and comment rulemaking is required to amend a previous interpretive rule. That's Ninth Circuit law. If you're going to amend a previous interpretive rule. What if the 1993 interpretive guidelines had said something about vertical line of sight, and the 94 guidelines were more aggressive and sort of contradicted what the 93 guidelines had said? Would the Department of Venom been under an obligation? I think that if they were just more detailed, more aggressive, I don't think there would be an obligation. In fact, the Erringer-Caraballo Court, which is one of those courts cited by the Independent Living, that's a D.C. circuit court, found at 11 F. 3rd, 186, it says, quote, an interpretive statement may supply crisper and more detailed lines than the authority being interpreted without losing its exemption from the notice and comment requirements under the APA. The Department of Justice is allowed, as it hands out more interpretive guidelines, to deal with issues that have come up, to clarify, to add additional gloss on its interpretation, as long as it is consistent with the regulation itself that's being interpreted. Once they do something that's inconsistent with the regulation, the regulation has the force of law, once they do something that's inconsistent with that or seeks to amend or change it in any way, they have to go through the Administrative Procedures Act. They have to provide notice and comment, period. They have to get comments that come in and be advised. And that's just not what happened here. Every court has agreed that their interpretive regulations in the Technical Assistance Manual is entirely consistent with the regulation itself. The only thing that can be argued that's being amended, if you look at this Technical Assistance Manual language, is the Access Board's commentary. So the only thing that's being amended is this interpretive rule by the DOJ is at best only amending another interpretive understanding by the Access Board. There is no change. There is no amendment. There is no repeal of the regulation itself. It's entirely consistent. Every court has agreed on that point. I have 35 seconds left, so I'd like to just cut to the chase on this part of the argument. It's really, you know, the Access Board consists of 25 people. There's 13 people appointed by the President. There's 12 people that are representatives of the different departments. One of those representatives is the Department of Justice. The Access Board is in the position where the Congress has said, you will come out with advisory guidelines, because there are experts in this field coming up with these things. And the Department of Justice will then look at your comments, and they have to adopt regulations that are consistent with the minimum requirements of the Access Board. This was their obligation. When the Department of Justice adopted the regulations itself, they also printed a whole bunch of their own commentary. It was silent on this line-of-sight issue. But they cannot be held bound by all the comments, the notices, the little musing commentaries that are in the Access Board. It's unfair to hold them bound to all that stuff. And we have a situation here where virtually immediately, I mean, like we're talking within months after the regulations become enforceable, they issue their own formal interpretation, where they clearly put the world on notice, and they say, look, line-of-sight's comparable in these kind of events means overstanding spectators. And all the other courts have said, that makes a lot of sense. It's entirely consistent. It's reasonable. And at best, if this does in fact modify a previous interpretation, it's not even a previous interpretation by their own mouth, but by the Access Board. It's just giving advisory commentary. And so there's several steps. You may want to wrap up. You're well over your time. Oh, I am. I'd ask the Court to carefully take a look at that and reverse the decision by Judge Lawson. Thank you. Excuse me. May it please the Court, my name is Karen Stevens, and I'm representing the Department of Justice as amicus here. I just wanted to quickly, there were a couple of questions that came up when Mr. Handy was here. You asked if the Access Board had ever gone on to address this question of line-of-sight, overstanding spectators. And I did just want to mention, you may have already been aware of this, that in 2004 they did issue a revised ADAG, as we call it, by abbreviation. And that revised ADAG does expressly address the question of line-of-sight, overstanding spectators, and has several more detailed requirements. So it was eventually handled in 2004. The other point I wanted to make quickly, before I move into my argument, is that while the supplement to the technical assistance manual was the most sort of formal and public interpretation that the department gave, in 1993, even earlier, and very soon after the regulations became effective, the department began in correspondence with facilities and in the context of its own investigations of these kinds of assembly areas to tell people who asked or people that they were dealing with that they interpreted this regulation to require line-of-sight, overstanding spectators. And I believe some of the earlier cases reference some of those letters that went out to facilities. We believe also, I would say, that while, as Mr. Handy conceded, there is certainly a plausible argument that the Access Board interpreted its own guidelines. Can I ask you a question? Excuse me. Absolutely. Those letters you're referring to, are they accessible to the general public? I'm not positive, Your Honor. I think at the time they probably were letters that just went out to individual facilities. Are they in the record in this case? They're not in the record in this case. How about the 2004 revised ADAG? That is publicly available. It was published in the Federal Register. And the department's current, the department itself put out an advance notice of proposed rulemaking, I believe, in late 2004, early 2005, which said that it would be issuing a notice of proposed rulemaking and that notice would be adopting, proposing to adopt the revised ADAG. Okay. I just want to make sure I understand what's going to go on. Sure. The department has not issued new regulations. The department? It is considering issuing new regulations in light of the 2004 revised ADAG from the Board. Exactly. Are those regulations likely to address by regulation as opposed to by interpretive rule this vertical line of sight problem? I think I can say that because, again, they called it an advance notice of proposed rulemaking, and because the statute requires that our regulations are consistent as a floor with the guidelines that are put out by the Access Board, the new rulemaking will propose to adopt at least those regulations. I'm curious as to why when the D.C. Circuit in Paralyzed Vets issues its decision in 1997, just three years after the TAM, and a year and a half later the Third Circuit disagrees with it, so that you have contradictory rulings in the Third Circuit and the D.C. Circuit, that the department didn't just cure this problem by regulation. That would have mooted the Caruso case if you had done so, but instead it looks like the Third Circuit's got one set of rules and the D.C. Circuit's got a different set of rules, and now we have to figure out who's right, and it's been more than 10 years since the D.C. Circuit issued its first ruling. Why didn't we just cure this? I sympathize with that. I think there are pros and cons when you have a statutory scheme and regulatory scheme that's as complex as the ADA with addressing each individual issue that comes up on an individual basis or taking a more comprehensive approach to revising the regulations. The department, for its reasons, has decided to take the more comprehensive approach. Well, the comprehensive approach has now taken 11 years since the D.C. Circuit, and it could have easily just come out and just cured the problem and said, so that there's no ambiguity, we are going to cure this so that... It could have, and I certainly today regret that they did not do that, but they've taken this more comprehensive approach. We'll try not to hold it against you personally. I appreciate that. As I said, as I was beginning to say as I opened that up, we think there's at least another plausible interpretation of the Access Board's own commentary, which is that the Access Board asked for questions. It said these guidelines may not be sufficient in assembly areas where people stand during events. We'd like to have comments on this. Comments came in. After the comments come in, they say many people said they think this is necessary. One way to look at it is there's sort of three things they could have done at that point. They could have said lines of sight are required, overstanding spectators expressly in their guidelines. They could have said lines of sight, overstanding spectators are not required in these kinds of assembly areas. They didn't do either one of those. What they said was... Do you think the second one would be consistent with the regulation? I think there's an argument that it's not, that this language could be interpreted either way. I think that's what the courts below have held, that it's reasonable in either way. And the third option... Comparable lines of sight. We certainly think the better argument is that this is the better interpretation, that it better effectuates the purposes of the statute, and it certainly does the best job of giving people with disabilities full and equal enjoyment of these kinds of events and facilities. But another option was to, as they did, we would argue, to say that we want to receive more comments and take more time to review this and not to box themselves or the Department of Justice at that point in on either way. Another, it's not just a question of whether to require these kinds of lines of sight, but there's also questions of the details. Again, if you look at the 2004 revised ABIC that has come out, it addresses things like lines of sight over the heads of the person standing in the first row, in the first row in front of their seats. It says that if patrons without disabilities have lines of sight between the heads of standing spectators, then wheelchair seats need to provide comparable lines of sight between the heads of standing spectators. So there were ways to... I don't mean to interrupt, but to... There were other questions sort of about what kinds of requirements to impose and what this really meant. And starting, again, developing all of these regulations so quickly after the statute had been passed, again, we would argue that these things were interpretations and details were being developed. Let's suppose that when the board addressed this, that the board made clear in its commentary that the vertical line of sight was, they believed was required by their guidelines. Yes. That would have obligated the Department of Justice to take that because by statute the Department of Justice's regulations must be at least the minimum required by the board. Yes. If the board had said more specifically, the vertical line of sight problem is not addressed at all and it therefore is not required by our guidelines but we will address it in future guidelines, would that have obligated, would the department then have been obligated to admit that the line of sight question was not addressed by its guidelines? That the board's guidelines are a floor? I would say no. I think they could say that that was a floor, that they said that these weren't required. The difficult part, of course, is that your regs were word for word what the board adopted. Right. That might be a question depending on. But again, I think, and Judge Camby's question alluded to this, that the text of the regulation that we have here I think is fully consistent with requiring lines of sight over standing spectators. I did want to reserve two minutes for rebuttal and I may have neglected to do that at the beginning. So I'll just quickly say now. We also would argue, though, that even if this court determined that the department was bound by an earlier interpretation of the board, holding that this regulation did not require lines of sight over standing spectators, that under the precedent of the circuit and under the APA, it's not necessary for the department to issue, to go through the formal notice of comment procedures under the APA in order to change that interpretation because it is just modifying a previous interpretation. Thank you. And I'll just take the remainder of my time for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. My name is Rima Bedoya and I'll be arguing the bulk of this morning's arguments. I'm going to reserve some time for Mr. Reed. Okay. Did you want us to mark it on the clock or do you want to just control it yourself? I think I'll control it myself. All right. You have 20 minutes and it's you. I don't know that I need 20 minutes. Okay. But thank you, Your Honor. We appreciate counsel's arguments and the points that they raise. Most of these points have been addressed in our brief, and they've gone beyond the issue presented here, which is the enforceability of the 1994 CAM. What this case is about is whether or not the CAM is enforceable as law, and we would argue that it is not, and we would urge the Court to affirm the decision by Judge Larson at the district level, who adopted the rationale in the holding of the Caruso v. Blockbuster decision, which was authored by Justice Alito. The government has already conceded in its point at the district level and both this morning that the DOJ has not engaged in rulemaking as of yet. In fact, at the district court level, and I can cite to the reporter's exhibit on page 10, the revised ADAG does specifically provide on this issue, and it's anticipated because the DAG guidelines, as we know, have to piggyback in a sense of being consistent with at a minimum. The ADAG and rulemaking, when it's issued, will then again provide these specifics and will then further on it goes above and beyond that, and that still hasn't happened. Right. The Department's in a little bit of a funny position. Again, this is a funny statute, because I can't think of too many other statutes. I can't think of any right offhand, but I won't deny that there might be some, where the Attorney General is obligated to adopt regulations that satisfy the minimum as adopted by some other board that doesn't have sort of direct rulemaking authority. So they're in a little bit of a funny position. So when the board decides to amend its regulations to address this line-of-sight question, it is conceivable that the board's regulations will be more strict than what is in the 1994 TAM, in which case the Attorney General will be obligated by statute to revise its regulations. I don't see what the Department said there to be inconsistent with anything that's been done so far. The real question is, why isn't the 1994 interpretive TAM law? Well, because it did not go through the proper rulemaking. Interpretative guidelines under the APA do not have to go through notice-and-comment rulemaking. Your Honor, if I can also. In 1991, the DOJ adopted 433, and at that time it talked about lines-of-sight comparable. It did not address enhanced sight lines, and that issue would be the subject of future rulemaking, not interpretation. No, that's not what DOJ said. That's what the board said. That's what the board said, but what the board said is imputed to the DOJ. Right. They adopted what the board said. The DOJ adopted the regulation. It didn't adopt any commentary. Right. I think it's imputed. If the board had run out and had a big press conference, and the chairman of the board had said, let me address the lines-of-sight question, because there were a lot of questions that came up, I don't think that the attorney general is bound by what the chairman of the access board, what statements he makes in a press conference. I understand that, but the DOJ and the access board work closely together, and it's imputed in the Caruso decision does a very good analysis, I believe, of why it's imputed, why the board's action is imputed to the DOJ. The conclusion is strongly supported by the following factors. Number one, the DOJ referred all comments to the board. The DOJ relied on the board. Number two, the DOJ relied on the board to make adequate changes based on those comments. Number three, the board specifically changed the language of 433.3 in response to comments and explained that change in its commentary. Number four, the DOJ was a member of the board and participated actively in the participation of both the proposed and final versions of the guidelines. And number five, the DOJ's commentary stated that the final guidelines promulgated by the board adequately addressed all comments. So it is definitely imputed. You used the phrase comparable lines of sight and enhanced lines of sight. Isn't the issue really here an interpretation of what comparable means? I believe if the comparable line of sight is, as the statute contemplates it, in fact its own title says location of wheelchair placement, it is talking about dispersal of wheelchair placement, that it offers that in a stadium such as the California Speedway, the seating should be the persons with disabilities are entitled to seating that is similar to those that are ambulatory spectators. And comparable lines of sight means that if you're sitting at the first baseline, you should be able to have seats there as well as elsewhere in the stadium. That's what comparable lines of sight means. Now, that's what at least the Caruso decision, which Judge Larson relied on, interpreted as a plausible interpretation when we're talking about the dispersal of where the seating is, and not that comparable lines of sight means a line of sight over standing spectators. Therefore, some of the circuits have disagreed with this interpretation, the paralyzed veterans of America, and so there's some ambiguity. When there is ambiguity, the board and the DOJ did not, they addressed it. They actually addressed it initially. They said we need to talk about enhanced lines of sight, and the decision was put off for future rulemaking. And, again, it was in 1994 after the other two TAMs had come out three years later. That's for the first time they're bringing up this issue that now we are going to take a substantive change in the law. And I submit, Your Honor, if it's not substantive, the Department of Justice would not be in now 2004 bringing that up. So it is a substantive change in the law where now for the first time in 1994, they're saying that you must provide lines of sight over standing spectators. Or is that just designed because they recognize that people are going to take their interpretation and they're now going to embed it into an actual regulation? I don't believe this is interpretation. I think this is a new substantive law, as the Caruso case points out. It is a fundamental substantive change where proper rulemaking is required. The essential, and I'm quoting now from the Caruso decision, the essential purpose of according Section 553 notice and common opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies. And so it's a substantial change. As Justice Alito concluded in his decision, we accordingly, we conclude that the DOJ's 1994 reinterpretation constituted fundamental change in interpretation that could only be made by adopting a substantive rule pursuant to notice and comment. Is there any test announced for when a rule is interpretive and when it's a substantive change that requires rulemaking? I mean, what's the definition of an interpretive rule? I believe the Caruso decision, Your Honor, touches on that, and it concedes that it is somewhat difficult taken together. The cases indicate that agency can alter the interpretation of the regulations in modest ways without requiring notice and comment. However, if an agency's new interpretation will result in significantly different rights and duties than existed under a prior interpretation, notice and comment is required. So I think if the, I believe that would be the test. I guess that's a test of you can do some but not too much, I guess. Right, and this would be doing substantially too much. We're going from now requiring that there be a line of sight over standing spectators when that was addressed in the beginning but they said we're going to put it off to future rulemaking. And until this date, that actually has not come about. I'm going to defer to Mr. Reed. Thank you, Your Honor. Thank you, Counsel. Good morning, Your Honors. I'm Brian Reed on behalf of California Speedway, and if it may please the Court, just a couple of points that I hope to follow up upon. First of all, when the Access Board, I think we give a bit of short shrift to the notion of rulemaking. The Access Board had public commentary. It wasn't a simple question of sight lines over standing spectators. There were commentary on both sides, obviously, and it was such a controversial position that they decided we're not going to decide this right now. That was not binding on the Department of Justice as we've talked about. The Department of Justice, when they adopted the ADA, could have gone beyond the Access Board and said, well, we are going to address it, and we're going to have rulemaking, and we're going to hear from all of the stakeholders, and we're going to make a decision. They could have gone beyond, but they didn't. And so when the Access Board punted, the Department of Justice punted. Counsel, let's suppose that there was no Access Board at all and that the Attorney General was just ordered to issue regulations, and the Attorney General issues the regulations in question here in 1991, and in 1994 issues a technical assistance manual saying it covers lines of sight. Is that a violation of law? That is a substantive change in law. So the Access Board is actually irrelevant to your argument. Your argument is just straight up, DOJ couldn't do what DOJ did, even if there wasn't an Access Board and there was no commentary by the Access Board. I think the relevance of the Access Board is, going to Mr. Handy's argument, the opposite. The Access Board put the Department of Justice on notice that this is an issue that should be addressed. So it's not they want to put the onus on the provider to, you know, out of abundance of caution. But in actuality, it was the Department of Justice that was on notice that this is an issue that should be addressed. It is an important point of public controversy. It's a point that should be addressed through formal rulemaking, and that's what they're doing today, apparently. It does require formal rulemaking. It does require the stakeholders to be heard from all sides before the law is changed, and that is what Judge Larson, I believe, ruled, and that's consistent with the Caruso opinion. Justice Hunt, you mentioned comparability, or a comparable line of sight. Isn't that the issue? Well, in actuality, it's not, because at this stage, at this level, we're up from summary judgment, and there has been a determination, it is not disputed on appeal, that the facility does provide a comparable line of sight. That's not the issue before the court. You mean it puts them in the same, I would almost characterize it as an angle of sight, as opposed to a line of sight, if you're talking about if people are at first base, or they're behind the plate, or what have you. We're talking about the angle of the sight, not necessarily the line of the sight, are we not? Well, we're talking about two things. One is that for purposes of where we are today, the disabled guest experience is comparable to the non-disabled guest experience. That's one. Two is a very good point, which is we're talking about a dynamic sporting event, where if an accident occurs at turn one, some people are going to have a really good view, and other people may not. That's very distinguishable. If there's an accident at turn one, everybody's going to stand up except the people in wheelchairs. That's probably true. And some of the people standing up will see, and some of the people standing up won't. And that, as I said, that is the comparable line of sight. That's the comparable experience to a non-disabled guest. So we're really beyond that. And the issue is, is that TAM the law? And, therefore, do we have to make sure that when the crowd stands up, all of the disabled guests can see, even though the non-disabled guests, some of them may not be able to see. If I can come back to your comment about the fact that the Department of Justice is put on notice by the board in its comment. Correct. Is not your client put on notice by the Department of Justice's interpretation of that regulation before they built this facility? Well, I think that there's notice all around. But my point is that I don't think it's fair to require a provider, such as a Speedway, to act out of an abundance of caution, and maybe this is going to be the requirement. It's the obligation of the Department of Justice to promulgate laws that are understandable and can be complied with. And my client did that. That isn't the issue. They complied with the ADA. They provided a comparable experience to the non-disabled guest. Or at least what they feel is compliance. Well, and on appeal, it's not been disputed. On appeal, it is not disputed that it is a comparable experience. It is disputed that it's not the heightened standard, the unobstructed view. That's the issue on appeal. I guess that makes the distinction between whether it's a rule and whether it's an interpretation. It seems to me what's being interpreted is, what does it mean by a comparable line of sight? And that interpretation by the Department of Justice was, it means that when people stand up to see that a person in a wheelchair has the same ability to see over those people who are standing up. That is definitely the Department of Justice's position. However... And that was their position before this facility was built. That was the position that was being, that was the subject of public hearing before the Access Board. And it was a point that was controversial enough, apparently, that the Access Board took no position. It was a point that they decided would need to be subject to rulemaking. And I don't think we should give short shrift to the notion of rulemaking. The Board decided that it would address it in future rule, which is the only way the Board can address it. DOJ was only obligated to adopt the minimum that the Board adopted. But it was perfectly free to go well beyond it. It was free to go well beyond it. It could have said, okay, you're not going to address it, but we are, because we think that this is important. And stakeholders... And DOJ was also free to say, we disagree with your commentary. They were? Which they did, in 1994. They made it pretty clear, put it in writing for everybody, that they disagreed with the commentary to the Board's prior regulation. They did, but they didn't go through the process, the fair process of rulemaking and hearing from the people that are stakeholders in that position. They changed the law, as Caruso and Judge Larson have determined. And I don't, who made that determination? What law did they change? I'm sorry? What law did they change? They changed the ADA. They changed what it was requiring of providers of entertainment. I thought that was all ambiguous. Nobody really understood what it was that the law said. They're interpreting what it says. They're giving their interpretation of what it says. Are you suggesting that they changed the act? I'm suggesting that the effect of their TAM was, in effect, a change of the law. From what? A change of the law. From an experience like this tract provides, which is a comparable line of sight, a comparable experience, to a guaranteed... You're talking about the tract's interpretation of what the comparable line of sight means. Which is really the issue here as to whether or not the Department of Justice can interpret that. I think that, well, as the issue of a comparable experience is not before the court. We agree it's a comparable experience. The tract, what's a comparable experience? That Mr. Miller's experience is comparable to the experience of the public attending the race. Even though he can't see over people standing up? Yes. When you say we agree, who is the we you're referring to? It seems to me the Department of Justice doesn't agree with that. Their interpretation back then was it means that they have to... Comparable line of sight means they have to be able to see over people who are standing up. Which is a substantive change of that interpretation and requires rulemaking because it puts a huge onus on the provider of the entertainment to configure the tract differently, or whatever the venue is. But because of how we've gotten here, we're not arguing over whether Mr. Miller's experience was similar to anyone else's, only whether his experience should meet the TAM requirement of the... Counsel, is the Speedway taking the position that the regulation, as interpreted by DOJ, is arbitrary and capricious, inconsistent with the Act? In other words, if DOJ in 1991 had said the line of sight means that you have to be able to see over people who are standing, is the Speedway going to take the position that that's arbitrary and capricious and therefore inconsistent with the ADA? Are you talking about the initial TAM? I'm saying that DOJ did it straight up in the initial regulation. Right in the regulation said, what this means is Speedway has to be able to offer them seats so they can see over people who are standing at curve one. Now, is the Speedway taking the position that that's arbitrary and capricious? The Speedway's position is that the Department of Justice could do that after going through the formal rulemaking process. If DOJ had just complied with notice of rulemaking, you do not have any challenge to the substance of the rule. I think that at that point, my client and other members of the public that are similarly situated would have at least had an opportunity to be heard and be considered, and maybe it would have adopted something different that's somewhere in between that doesn't put such a significant onus on the provider and yet addresses the concern that's being addressed by, you know. But you have not made an allegation in the district court or anything else in this case yet that such a regulation would be arbitrary and capricious, and therefore subject to substantive challenge under the APA. I don't think that we would suggest that. We just suggest that they need to go through rulemaking, which they're doing, which I think is an acknowledgment of the substantive alteration of these guidelines, the interpretation. I think I've stated my piece, Your Honors. If there's any other questions that I could address in 40 seconds, I'd be happy to. You're actually over. Oh, I'm sorry. You're actually over your time. Then I will sit down. Thank you very much, Mr. Reed. All right. Ms. Stevens, I think you have a little bit of time remaining. I'd just like to emphasize again that even if this court concludes that this is a change in the interpretation of Section 4.33.3, notice and comment is not required. The APA does not require notice and comment for changes in interpretive rules, cases in this circuit. Yeah, at some point, though, we have to say, well, it's not just a change in interpretation. It's well beyond that. Yes, and this court has laid out a standard for that. It said that if you have an interpretation that effectively amends a prior legislative rule, that might require notice and comment, but interpretation only amends a prior legislative rule for purposes of that if it's inconsistent with another, with a regulation that has the force of law. And what we would submit here is that the guideline is what has the force of law here. The guideline is 4.33.3, which says lines of sight comparable to those of patrons without disabilities. And I think everyone agrees that the interpretation of the Department of Justice is not inconsistent with that. It's a reasonable interpretation of that law. The only thing that it is changing is a prior interpretation of that same regulation. And so that does not amount to an effective substantive change. That would require notice and comment. And, again, the fact that the change has significant impact on people who are regulated in and of itself does not mean that it requires notice and comment. This court has said that in prior decisions, and so has the Supreme Court. And I guess the other point we would make is that even changed interpretations, while they may not receive the same level of deference from a court as a longstanding or always consistent interpretation, are entitled to some deference from a reviewer court. And we would urge this court to defer to our interpretation, or if you decide that full deference isn't warranted, use your own authority to interpret the regulation and to hold deadlines of sight over standing spectators are required here. And unless you have further questions, thank you. Thank you. We appreciate the helpful arguments of all counsel. Miller is submitted.
judges: Canby, Bybee, Hunt